Von Lingen and others *v.* Davidson and others.

Davidson and others *v.* Von Lingen and others.

*(District Court, D. Maryland.    March 6, 1880.)*

CHARTER PARTY—"ABOUT TO SAIL."—The words "about to sail from Benizaf with cargo for Philadelphia," contained in a charter-party, *held* to mean, under the circumstances of this case, to sail as soon as with reasonable diligence a cargo could be got on board.

SAME—"EVERY WAY FITTED FOR THE VOYAGE."—The stoppage of a steamer for five hours at a port in the course of her voyage, for the purpose of taking in a small quantity of additional coal, *held*, under the circumstances of this case, to be no breach of a provision in the charter-party that such steamer was "in every way fitted for the voyage."

In admiralty.

These are cross libels filed by the charterers and owners of the British steamer "Whickham."

The British steamer "Whickham," belonging to T. H. Da-

vidson and others, citizens of Great Britain, as appears from the log-book, sailed from Shields on July 9, 1879, with a cargo for Lisbon, arriving there on July 16th. She discharged her cargo and sailed thence in ballast on July 23d for Benizaf, on the coast of Morocco, under charter for a cargo of iron ore. She passed through the Straits of Gibraltar on July 25th, and at 4:30 P. M. on Saturday, July 26th, came to anchor in Benizaf Bay. On Monday, July 28th, she began taking in her cargo of iron ore, and continued taking it in from day to day, and finished at 5:30 P. M. on August 7th, got under way at 6:30 P. M., and sailed for Philadelphia. She stopped some five hours at Gibraltar, on August 9th, for coal, and, taking in 45 tons of coal, had a prosperous voyage, arriving at Philadelphia on September 2d.

Messrs. Gregg & Co., ship-brokers of Philadelphia, were, about August 1st, authorized, by cable message from the owners in England, to procure for the "Whickham" a charter to carry grain from the United States on her return voyage, and they, not finding a desirable charter for her in Philadelphia, authorized Mr. Eareckson, a ship-broker in Baltimore, to look for a charter for her in that city. Mr. Eareckson's authority was by telegraph, and represented the vessel as sailed, "or about to sail," from Benizaf. Messrs. Schumacher & Co., of Baltimore, being under contract to ship a large cargo of grain by steamer during the month of August, had employed Mr. Ford, of Baltimore, a ship-broker, to procure for them a suitable steamer, and he finding steamers for August very scarce, and hearing of the "Whickham," took Mr. Eareckson to the office of Schumacher & Co., and suggested that the "Whickham" would answer their purpose. Schumacher & Co. doubted if the steamer would arrive in time, and explained that, unless they could load and clear the vessel within the month of August, she would be of no use whatever to them. Mr. Eareckson, however, made a calculation to show that the steamer would arrive in time, and Schumacher & Co. agreed to take her. *This was on August 1st.*

A charter-party was prepared by Messrs. Gregg & Co., of Philadelphia, and signed on behalf of the owners, and sent to

Schumacher & Co., but they refused it as it, contained the words "sailed or loading at Benizaf," which they claimed was not the agreement.   Another charter-party was then executed by Gregg & Co. containing the words "sailed or about to sail from Benizaf," which was accepted and agreed by Schumacher & Co., and that is the contract under which this controversy arises.

It appears that during the negotiation Schumacher & Co. endeavored to get a stipulation inserted in the charter-party that the vessel would arrive in time for the August shipment, but that was refused.   It also appears that in the printed charter-party used there was a stipulation in this language: "Charterers to have the option of cancelling this charter-party should vessel not have arrived at loading port prior to ————." This was erased by drawing a pen through it.

The portions of the charter-party material to this litigation were as follows:

PHILADELPHIA, August 1, 1879.

"It is this day mutually agreed between T. H. Davidson, Esq., owner of the British steamship 'Whickham,' of London, built 1876, at Newcastle, of 1124 net tons register, or thereabouts, classed 100 A. 1 in British Lloyds, *now sailed or about to sail from Benizaf with cargo for Philadelphia,* and Messrs. A. Schumacher & Co., that said steamship being tight, staunch and strong, and in every way fitted for the voyage, with liberty to take outward cargo to Philadelphia for owner's benefit, shall, with all convenient speed, sail and proceed to Philadelphia or Baltimore, at charterer's option, after discharge of inward cargo at Philadelphia, and there load from said charterers, or their agents, a full and complete cargo of grain, etc., etc., and being so loaded shall therewith proceed to Queenstown, Falmouth or Plymouth, for orders to discharge at a safe port in the United Kingdom, etc., and deliver the same on being paid freight, six shillings and three pence sterling per quarter of 480 lbs., etc., in full of port charges, etc., (the acts of God, restraints of princes and rulers, the dangers of the seas and navigation, accidents to boilers, machinery, etc., always excepted.)   Fifteen running days, (if vessel not

sooner dispatched,) commencing when vessel is all ready and prepared to receive cargo, and written notice thereof given to charterers, to be allowed for loading and discharging vessel, and if longer detained charterers to pay demurrage at the rate of 40 pounds British sterling, or its equivalent, per day. Penalty for non-performance of this agreement, estimated amount of freight."

It further appears from the testimony that on the eighth day of August Schumacher & Co., having become uneasy about the "Whickham," got Gregg & Co. to send a cable message to the owners for information, and on the ninth day of August, learning that she had just that day passed Gibraltar, they concluded that she would not arrive in time for their purpose, and determined to look for another vessel, and on the sixteenth day of August chartered another steamer, at an advance of nine pence a quarter, she being the only other steamer which could be obtained suitable for the purpose.

The "Whickham," arriving in Philadelphia on September 2d, discharged her cargo of iron ore with dispatch, and sailed for Baltimore on the 7th, arrived in Baltimore on the 9th, where she was tendered to Schumacher & Co. on September 11th. Schumacher & Co. refused to load her, and filed their libel *in personam* against the owners, for their damages in being obliged to charter another vessel at a higher rate, alleging that the "Whickham," at the date of the charter-party, had not sailed nor was she about to sail from Benizaf, and that by reason of the breach in said contract and warranty, and the delay in the arrival of the steamer at Philadelphia arising therefrom, they were not afforded an opportunity of loading said steamer with grain, either in Philadelphia or Baltimore, during the month of August, whereby they had sustained $2,000 damages.

The owners of the "Whickham" answered, and also filed their cross-libel, alleging that on the day of the date of said charter the steamer *was* about to sail from Benizaf, and did proceed with all convenient speed to Philadelphia, and having discharged her inward cargo did, in accordance with said charter, proceed to Baltimore and was ready to receive cargo

from the charterers, (of which written notice was given to them,) but that the charterers had, without cause, repudiated the charter and refused to load said vessel; that said steamer, as soon as possible after said refusal, was re-chartered at the risk of said charterers, at the best rate that could be had, and that finding that a better charter could be obtained in New York than elsewhere, she took a charter from that port at a loss in freight of $1,912.58; and that she lost by the increased expenses and loss of time, and expenses at New York, $1,000 additional, so that the whole loss of the owners was upwards of $3,000.

Obviously the solution of this controversy, involving so considerable a loss to both parties, depends upon the interpretation of the words "about to sail from Benizaf with cargo for Philadelphia."

It is claimed that in interpreting the meaning of these words the court is to give weight to the facts stated by the charterers in the negotiations preceding the signing of the charter party, and particularly to the fact then made known by Schumaker & Co. to the agent of the owners, that unless the steamer arrived in time for the August shipment the object they had in chartering the vessel would be entirely frustrated; that time was to them of the very essence of the whole contract, as they understood it, and that this they fully explained to the agent of the owners; and as, by reason of the non-arrival of the steamer during August, their object was frustrated, the court should put upon the words "about to sail" a stricter interpretation than in a case where, notwithstanding the non-arrival of a vessel within the expected time, the purposes of the charterer might still be practicable.

This doctrine is fully considered by the supreme court of the United States in the case of *Lober* v. *Bangs*, 2 Wall. 728–736, and the conclusion announced by the majority of the court is that the frustration of the purposes of the charterers cannot affect the construction of the contract, but that the contract is to be construed with reference to the intention of the parties at the time it is made, without reference to subsequent events, the intention of the parties being derived from the

*language of the instrument,* and that, when the meaning of the language is not clear, the court is to construe it in the light of the circumstances surrounding the parties when the contract was made.

With regard to the *facts* of this case, although it does not appear distinctly in the testimony, it was stated in argument, and seems to be a conceded and generally known fact, that Benizaf is a loading place on the coast of Morocco, about 24 hours, by steamer, from Gibraltar, from whence is shipped iron ore. It is not a port or harbor, but simply a convenient loading place for shipping the iron ore mined in that vicinity. It is not unfair, therefore, to presume that any one contracting with regard to a vessel at Benizaf knew for what purpose she was there, and the nature of the cargo she was there to take in; and when Schumacher & Co. negotiated and contracted with regard to a steamer about to sail from Benizaf with cargo, they must be presumed to have known that she was there taking in a cargo of iron ore, in the usual manner in which cargo is taken in at that place.

There is no proof of any usage among ship-owners and charterers by which any peculiar meaning is given to the words used in the charter. There is no proof, indeed, as to what period of time the charterers themselves, when making the contract, thought the words "about to sail" should cover.

For the purposes of this contract I think the court must take the words themselves, and determine their meaning with reference to such a vessel as the "Whickham," when at Benizaf, under the circumstances as known to both parties.

The words "about to sail" had reference primarily to the steamer's leaving Benizaf, and indirectly only to the time of her arriving in Philadelphia; and it is to the circumstances surrounding her at Benizaf that we are to look for light, and not to the expectations of the charterers as to her arrival at Philadelphia. The words used in the contract were the words which it was known to all the parties the agent of the owners was authorized by them to use, and it is plain that the necessity of the charterers to have the steamer in time for the

August shipment of grain cannot affect the meaning to be given to the language.

It is apparent that the words "about to sail from Benizaf with cargo" must have been understood to cover some period of time. It would not be reasonable to suppose the charterers ever thought they meant that the ship had all her cargo on board and was weighing anchor, or getting up steam, or was in any such state of forwardness as that she could leave Benizaf within an hour or two. It is not reasonable to suppose that the owners were willing to bind themselves, with regard to a vessel in so remote and inaccessible a place, to such a point of time. It must, I think, have been understood by the charterers that some delay in the departure of the vessel was covered by the language.

Gibraltar appears to be the nearest point of telegraphic communication. Neither the owners nor charterers could know anything of the "Whickham" except that she passed in through the Straits of Gibraltar on July 25th. It was to be presumed, on August 1st, that she had reached Benizaf, and had been there five days, and therefore had either sailed for Philadelphia, or was about to sail as soon as she got her cargo on board, which was the only thing to detain her.

As matter of fact she had for two days been receiving cargo. She was ready to receive it on Sunday, July 27th, but received none on that day; on Monday, 28th, she did take in about 115 tons, and on Tuesday, the 29th, about 90 tons; on the 30th she received none, and 31st only four boat loads. The process of loading at Benizaf is proved to be that the vessel lies at anchor about a quarter of a mile from the coast, in the roads. Small boats, carrying from five to seven tons each, come along-side, and the ore is passed up the ship's side in small baskets, of about fifteen to the ton. There are two or three stages from the boats to the ship's decks, and two men at each stage receiving and passing the basket. It is proved that there were two gangs of men on each side of each of four hatches, so that there were about eight boats along-side at one time unloading into the ship.

The ship's officers swear that the cargo was taken in with

diligence and dispatch; that at first there was some delay resulting from there being two other steamers ahead of them, who had the right to be first loaded, and for the first three days the "Whickham" was more or less interfered with, and the witnesses testify that the delay in all may have resulted in a loss of about two days' time. They state that the "Whickham" had steam up for several hours before the loading was completed, and that she sailed within an hour and a half after the last basket of ore was taken on board.

What do these facts show with regard to the surroundings of the steamer at the date of the charter, and what assistance do they afford us in getting at the meaning of the statement that the steamer was then "about to sail from Benizaf with cargo for Philadelphia?"

They show that the steamer was to bring the usual cargo from that place, and that it was being put on board in the usual manner; that she had been at the place five days. They show that she had not then sailed, because she had not completed taking in her cargo; but that she did complete taking in her cargo with reasonable diligence, and, being in every respect fitted for the voyage, did, as soon as her cargo was on board, proceed with all convenient speed to Philadelphia. Either I must hold that "about to sail with cargo" meant that the steamer had her cargo all on board, and had nothing left to be done but to get up her anchor and start, which is an unreasonable and strained interpretation of such words in a contract with reference to a vessel in so remote a place; or I must hold that they meant that she would sail in 12 hours, or in 24 or 48 hours, or some other definite time after the signing of the charter-party, which would be making for the contracting parties a contract which they did not themselves make; or I must look at the known employment of the steamer at the date of the contract, and hold that the words meant that, as loading her cargo was the only thing which could be supposed to be detaining her at that place, she was to sail as soon as, with reasonable diligence, she could get her cargo on board; and this, I am of opinion, is the proper interpretation of the contract. The word "about" can only be

construed with reference to the subject-matter and circumstances with regard to which it is used; it has a more uncertain meaning than the words "almost," "nearly," "well nigh;" and, unless I adopt the method last above indicated, I think we are entirely without any guide in ascertaining its meaning as used in this charter, and what was the intention of the parties expressed by it.

It plainly appears from the contract that the charterers took a great many risks, in respect to the steamer arriving in time for their purpose, which they would not have taken if they could have obtained the stipulation which they tried to get from the owners, but could not, viz., a stipulation that they were to be released if the steamer did not arrive in time for the August shipment. They were refused that stipulation, and they took the charter without it, and assumed all the risks of her non-arrival by reason of the weather and the accidents of navigation, which always rest upon the charterer unless there is a stipulation that the vessel shall arrive by a particular day.

There are, in the reports, numerous decisions in which long delays, even extending to one and two years, arising from embargoes or perils of the sea, have been held not to absolve the charterer from loading the vessel when finally tendered. There is no argument, therefore, to be adduced from the alleged hardship of the case. In dealing with contracts with regard to vessels there must frequently be great losses arising from delays for which neither owner nor charterer is to blame. Upon whom that loss must fall must be determined by the contract; and, as was said in *Dimeck* v. *Cotlett*, 12 Moore's Privy Counsel Cases, 228, "if the parties have not expressly stated for themselves in the charter-party that unless the vessel sailed by a specified day the charter-party should be at an end, the court ought to be slow to make such a stipulation for them."

I have examined with care the decisions which were cited by counsel, but I have not been able to find that in any case at all similar to the one under consideration, and in which no particular day or period of time was stipulated for the sailing

or the arrival of the vessel, the charterer was held to be absolved.

It was also urged on behalf of Schumacher & Co. that, as the charter-party represented that the steamer was in every way fitted for the voyage, it was a breach of the contract for her to stop at Gibraltar for coal. By the ship's log it appears that her stop there did not exceed *five* hours, and was solely for the purpose of taking in a small additional quantity of coal. Gibraltar was not out of her course; she must of necessity pass in proximity to it—it is a well-known coaling station for steamers—and I think it entirely too harsh a construction to hold that a steamer stopping so short a time and under such circumstances is a deviation, and was not proceeding with all convenient speed to Philadelphia.

The conclusion to which I have arrived is that Schumacher & Co. were not released from their obligation to load the vessel when she was tendered to them, and that they are liable to the owners for the damages resulting from their refusal so to do.